UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

BRADLEY BEENEY,            13 CV 8022 (GBD)

      *Plaintiff*,

   v.            **PLAINTIFF'S AFFIDAVIT IN OPPOSITION TO**

INSIGHTEC, INC., AMIT SOKOLOV, *and*      **DEFENDANTS' MOTION TO**
NEHA DHAWAN,            **DISMISS OR TRANSFER**

      *Defendants*.
----------------------------------------------------------------X

STATE OF MARYLAND     )
                                ) ss.:
COUNTY OF BALTIMORE CITY   )

      BRADLEY BEENEY, being duly sworn, deposes and says:

      1.    I am the plaintiff in the above-captioned action. At all times relevant to this action and continuing to the present, I have resided at 312 11th Avenue, Apartment 23H, New York, New York 10001. I have personal knowledge of the facts and circumstances set forth herein.

      2.    I submit this affidavit in opposition to Defendants' motion (a) to dismiss or transfer venue, (b) to dismiss claims in the Complaint against Individual Defendants for lack of personal jurisdiction, and (c) to dismiss as against Defendant Sokolov for insufficient service of process.

      3.    As alleged in my Complaint (Garland Mov. Aff., Exhibit A), I seek damages against Defendants pursuant to the New York City Human Rights Law, N.Y.C. ADMIN. CODE §§ 8-101–31 ("NYCHRL"), and the Fair Labor Standards Act of 1938[1] as amended, 29 U.S.C. §§ 201–19 ("FLSA") in connection with my employment by Defendant InSightec while I lived and worked in New York City. I assert that Defendants illegally discriminated against me based on my sexual orientation as a gay male and my domestic partnership status with another male, and failed to pay me overtime wages when clearly I was not an exempt employee under

---

[1] I also bring similar claims under New York Labor Law.

applicable law.  This Affidavit supplements my Complaint as well as addresses Defendants' assertions in support of their motion to dismiss and/or transfer this action to Texas.

Background Facts Delineating Defendants' Violations of NYCHRL and FLSA

4. I am a licensed engineer with a background in MRI and radiology.  In and around December 2012, I responded to an ad InSightec posted on LinkedIn for a Clinical Engineer position.  InSightec, a U.S.-based subsidiary of the Israeli company, InSightec, Ltd., manufactures and sells advanced technological equipment worldwide for non-invasive treatment of various health conditions, including uterine fibroids, bone metastases, and neurological disorders.  In late December 2012, I began communicating about the position via email with Defendant Dhawan, an InSightec Clinical Engineer.

5. While in New York City, in early January 2013, I interviewed by telephone with Defendant Sokolov from Israel, who also would be responsible for training me in using InSightec's products and services and to whom I was to report.  I was also told that that if I was hired, I would have training with Sokolov in Haifa, Israel for approximately three (3) to four (4) weeks, to which I agreed.

6. In late January 2013, I interviewed in-person in Dallas, Texas with Dhawan, and with Sokolov via Skype from InSightec's Dallas office.  By letter dated February 11, 2013 sent to me in New York City, InSightec offered me the position of Clinical Applications Engineer in at a starting annual salary of $66,000.  By Employment Agreement dated February 13, 2013 sent to me in New York City, I accepted InSightec's offer and, at Defendants' direction, worked for InSightec from my New York City apartment.  To commence employment and allow me to begin working while in New York City, Defendants gave me a laptop computer and a corporate AMEX card to use for expenses, arranged for me to be paid by direct deposit into my personal bank account in New York City, at Bank of America, 224 8th Avenue, New York, New York

10011; gave me an InSightec email address an email address at bradleyb@insightec.com, and manuals and training materials to learn about the device I was working on.[2]

7. In late February 2013, I went to Dallas for a one-week on-site introduction and orientation.[3] Defendant Dhawan asked me when I could move to Dallas and I told her I believed that my New York City lease expired on April 1, 2013[4] so I would move just after, to which there was no objection. During that orientation week in the Dallas office, I did not conceal my sexual orientation. During my visit, I received text messages while my mobile device was in view of Dhawan, from my domestic partner (now husband) who has an unambiguously male name. These text messages, such as "I miss you" and "love you" highly suggested that I was in a relationship with a man. Dhawan asked me about my personal life, if I was married and/or had children, to which I responded "no."

8. After the orientation week, when I returned to New York to continue working, Defendants' attitude towards me changed; Defendants began to alienate me and refused to facilitate teamwork or training for InSightec's devices and services to be offered to its clients. I was prevented from interacting with InSightec's Israel team altogether, other than one (1) "check in" call from Defendant Sokolov to me in New York City. Although Defendants previously told me that it would take me at least six (6) months of on-site training with mentors to become qualified to meet with clients on my own, Dhawan suddenly expressed an expectation that I immediately understand the technology.

9. After the training, during March 2013, Defendant Sokolov, through Defendant Dhawan, directed me to complete various projects on a weekly basis (mostly data entry

---

[2] The device is known as an "ExAblate," which is a non-invasive, high energy, ultra-sound surgery device used to treat tumors.

[3] I planned to eventually move to Texas after working in New York and training in Israel. During my orientation week, I met with InSightec's human resources and benefits manager, Patricia Ward ("Ward"). She instructed me to fraudulently use InSightec's Dallas office as my place of residence for payroll purposes because she did not want to have to comply with New York laws pertaining to employees. Ward also stated that since I would be moving to Texas within a few months, using a New York address would present too much work for her.

[4] The Complaint inadvertently, incorrectly states that I told Dhawan that my lease expired on April 30, 2013, but the lease term was until April 1, 2013. This date error, however, does not materially impact the case or the facts supporting my claims.

assignments, as though I was a clerk), working approximately fifty (50) to sixty (60) hours per week; however she provided little to no instruction or guidance.  Further, Dhawan often sent me complex projects on Friday at 2:00 p.m., unreasonably demanding that they be completed by 5:00 p.m.  Because such work was impossible to complete within such tight and arbitrary deadlines, I was constantly forced to work weekends, submitting my work on the following Monday.  In addition, the data entry assignments I was to complete did not require any independent judgment on my part, and I never was paid overtime for my work.

10.     From the beginning and throughout my employment with InSightec, Defendant Sokolov was the driving force behind my work assignments to be completed in New York, notwithstanding that Dhawan was the individual instructed me on his assignments, verbally or via email.  I know this because Dhawan always referenced Sokolov and/or his office as creating the assignment.  And, Dhawan and I were supposed to speak at least weekly, every Monday morning, regarding my outstanding assignments and new ones for the forthcoming week -- at times when there was a delay in Dhawan contacting me regarding the weekly assignment, she attributed the delay to "Amit [Sokolov] in Israel."  Further, when Dhawan apparently was on vacation in early May 2013, Sokolov contacted me directly regarding my assignments.

11.     Given Defendants' lack of guidance on my ongoing work assignments, I often requested clarification and/or information from Defendant Dhawan.  However, she and the other Defendants continued to refuse to assist me in performing my duties.  For instance, Defendants sent a laptop to me in New York from Israel.  The laptop had a foreign keyboard and a power adapter that had been taped together; as a result, it prevented me from being as efficient as I could have been.  On multiple occasions, I brought these problems to Dhawan's attention, but she never responded or addressed the issues.  All of this discriminatory workplace conduct occurred in New York City, after I returned from the training in Dallas.

12.     Dhawan also began to become aggressive about where in Dallas I was to live, after it became clear to her that I was gay and moving to Texas with my male domestic partner.  When I advised Dhawan that my domestic partner and I were attempting to secure local housing,

4

Case 1:13-cv-08022-GBD   Document 27   Filed 04/15/14   Page 5 of 9

Dhawan suddenly announced, in a threatening manner, that all housing plans must be approved by her. Shortly after, I informed Dhawan that we had secured housing in Dallas, within walking distance to InSightec's office, less than a mile. She outright rejected my choice without justification, demanding that I select another place.

13. Shortly thereafter, I asked her about the mandatory training in Israel. She responded that they were postponing my training in Israel as well as my relocation to Dallas, with no reason afforded.

14. In late April 2013, Defendant Sokolov directed me to meet him at a client facility in Virginia. After the meeting, Sokolov inquired about my plans going forward regarding relocation to Dallas and training in Israel. I assured Sokolov that I wanted to go to Israel to complete the training and that my domestic partner and I had secured housing in Dallas and had broken their New York City lease. Sokolov promptly replied, in substance, that "while what he was about to say "may not be politically correct," he "did not care," he felt I did not fit into the company's "culture," and that if he were I, he would be looking for another job.

15. Following this conversation, I had no other communication with Defendants for approximately one (1) week. During that time, I waited in his New York City apartment with everything in boxes, making U-Haul arrangements while my partner was contacting headhunters in Dallas. However, I had no knowledge of whether I should proceed to move to Dallas, no idea even if I even had a job; my life was in complete limbo. The following week, my laptop computer from Israel stopped working for no apparent reason and I was unable to perform any work. I asked Dhawan if I could come to the Dallas office to work on the assignments she was giving me. Defendant Dhawan said "no" and told me to use a computer at a public library in New York, and set further deadlines for me that were impossible to meet considering my lack of access to a company computer.

16. About a week later, Dhawan sent or arranged to have sent to me a different laptop; however, none of my emails or documents were on it. Apparently Dhawan was on vacation in the first two (2) weeks of May; Defendant Sokolov sent me several emails in New

5

York City to follow up on the work assignments Dhawan previously had given me. When I understood that Dhawan had returned to the office, I continued to ask her for work. She told me that "it might not be necessary." A week or so later, I emailed her to schedule a call regarding outstanding work. Dhawan called me in New York and told me, in substance, that while I was "improving," she was recommending my termination, and hung up. By letter dated May 29, 2013 sent to me in New York City, I was notified that my employment was terminated.

17. During the entire time I was working for Defendants in New York City, I never supervised anyone, nor did I have the right to control or make decisions regarding other InSightec employees. Furthermore, I did not have the authority to exercise independent judgment over any task. Again, my assignments were mostly akin to data entry.

<u>Defendants Derive Substantial Revenue from Interstate or International Commerce</u>

18. Defendant InSightec is a U.S.-based subsidiary of a "pioneer and global lender in MR guided focused ultrasonic (MRgFUS) technology." *See* Harman Decl., Exhibit C. Also, upon information and belief, InSightec's revenue from interstate or international commerce is substantial (*Id*.); for example, I recall that in and around the period of my employment in 2013 there were approximately one hundred (100) of InSightec's ExAblate machines installed worldwide, with each machine having a retail price of over $1 million.

19. In addition, upon information and belief, InSightec seeks sales of its products and services in New York. For example, I am aware that one hospital, Long Island Jewish Hospital on Long Island, New York had purchased an ExAblate machine from InSightec, and subsequently returned it.

<u>The Convenience of Witnesses and Balance of Equities Favors New York, My Chosen Forum</u>

20. As my attorney Walker G. Harman, Jr. stated to this Court on February 25, 2014, I have authorized him and/or others in his law firm to go to Dallas, Texas to take depositions of parties and non-party witnesses, if necessary.

21. Defendants submission of declarations from purported witnesses, all of whom are employed by InSightec is not compelling and merely shows Defendants' desperate, disingenuous

attempt to transfer this case to Texas simply to harass and intimidate me. Further, with the exception of Individual Defendants Sokolov and Dhawan, I had little or no contact with the Defendants' other declarants and some of the individuals do not even purport to allege that they had any input whatsoever into my hiring, management of my work assignments, assessment of my work performance, and (most importantly), the discriminatory decision to fire me. And, for those declarants in Texas that Plaintiff wishes to depose, as stated above, my attorney will go to Dallas to depose them.

    22.    <u>Defendants' Corporate Employee Witnesses</u>

    (i)    With respect to declarant Raquel Alashoor, I do not recall having any conversation with her other than that she ordered lunch for me once or twice during my week in the Dallas office, and that some email exchanges regarding return of company property after I was fired.

    (ii)    With respect to declarant Haya Zarko, a Human Resources person in Tel Aviv, I never met her and do not recall having any conversation with her regarding my employment performance or termination; I recall only that she sent me the initial offer letter and letter of termination as attachments to a transmittal email.

    (iii)    With respect to declarant Patricia Ward, my contact with her was limited to arranging my paperwork while I was at the Dallas office for payment to be sent to my New York City bank when I returned to New York City to start work. Ward Mov. Decl. ¶¶ 3–6. When I met with her she expressed that she could not be bothered with figuring my applicable taxes for my work in New York, so she was giving me a fake home address in Texas even though I did not live there—the office address. I will have my attorney depose Ward in Dallas regarding InSightec's tax evasion tactics and other pertinent issues.

    (iv)    With respect to declarant Nadir Alikacem, I met with him during my first visit to the Dallas office. Contrary to the statement in Mr. Alikacem's Declaration at ¶ 3, he never said that I had to move to Dallas as soon as possible for the purposes of my employment. Mr. Alikacem also expressed that there is a "weird culture" at InSightec, and that if one does not fit in, he/she should quit. I will have my attorney depose Mr. Alikacem in Dallas.

23.    I submit that there are at least two (2) non-party witnesses who reside and/or work in New York County and will provide testimony related to the claims and defenses in this action:

7

24. <u>Plaintiff's Non-Party Witnesses</u>

(i) Matthew Newsom, my husband, resides and works in New York City. He will testify, *inter alia*, about the hours that I worked in excess of forty hours per week, the ongoing work assignments I received from Defendants, my frustration with the unworkable equipment they furnished to me, and the humiliation and degradation I suffered being stuck in our apartment for nearly two (2) months with our belongings in boxes while being told my move was "on hold" and my fear that I no longer had a job.

(ii) Lucy Hason, the Building Manager at my New York apartment, resides and works in New York City. She will testify, *inter alia,* about the utter frustration I expressed as my New York apartment lease had expired but I had no place to move to. As such, I was forced to sign a month-to-month lease with a specific move-out clause, which is never done in my building. As such, I had to accept a 4% increase in rent, higher than a typical renewal rate for the building as a result of my uncertain circumstances.

25. It is clear that a substantial part of the events that form the basis of my claims against Defendants occurred in New York City because my employment relationship with Defendants developed, progressed, and then terminated in New York City. I suffered severe emotional distress and financial damages in New York City as a direct consequence of Defendants' illegal actions. Defendants' contacts with me in New York justify proper venue here because they were frequent and directly relate to the subject matter of this litigation.

26. After Defendants fired me, I had a long period of no income, although I tried to find work as soon as possible. I am an individual of modest means. If I am forcd to litigate this case in Dallas, I will suffer great hardship.

27. I selected a proper forum and my financial means pale in comparison to InSightec's international, million-dollar company, such that this Court should deny Defendants' motion to transfer. In addition, because I worked in New York and sued Defendants for anti-discrimination protections under local statutes, a New York court and New York City jury should preside over my claims.

WHEREFORE, I respectfully request that this Court issue an Order (i) denying Defendants' motion in its entirety; (ii) awarding me attorneys' fees and costs in connection with this motion; and (iii) granting to me such other and futher relief as this Court deems just and proper.

_____
Bradley Beeney

Sworn to before me this

_15_ day of April 2014

_____ 4-15-2014
Notary Public

```
MARIA T. AMADOR
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
My Commission Expires 6-20-2017
```

9